**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | Crim. Action No. 2:16-551-MBS |
| v. | ) | |
| | ) | |
| Panagiotis Koutoukakis and | ) | **ORDER** |
| Herbert Julian, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

In February 2016 the government indicted Defendants Aegean Shipping Management, S.A.; Aegeansun Gamma Inc.; Panagiotis Koutoukakis; Herbert Julian; and Nikolaos Bounovas (collectively, "Defendants") in a six-count indictment.

### I.    FACTUAL BACKGROUND

Count One charged Defendants with violating 33 U.S.C. § 1908(a), through a violation of the underlying regulation found at 33 C.F.R. § 151.25, failure to maintain an Oil Record Book ("ORB") or alternatively violating 18 U.S.C. § 2, by aiding and abetting the violation of 33 U.S.C. § 1908(a). Count Two charged Defendants with violating 18 U.S.C. § 1519, destruction, alteration, or falsification of records with the intent to impede an investigation or proper administration of any matter within the jurisdiction of the United States or any agency of the United States or alternatively violating 18 U.S.C. § 2, by aiding and abetting the violation of 18 U.S.C. § 1519. Count Three charged Defendant Julian with violation of 18 U.S.C. § 1505, obstruction of justice. Counts Four and Five charged Defendant Aegean Shipping Management, S.A. and Defendant Aegeansun Gamma Inc. with violating 18 U.S.C. § 1505, obstruction of justice. Count Six charged Defendants with violating 18 U.S.C. § 371, conspiracy to defraud the government or commit any offense against the United States.

1

Defendant Aegean Shipping Management, S.A. pleaded guilty to Counts One and Five on November 29, 2016. ECF No. 169. Pursuant to the plea agreement, at sentencing, the government dismissed Counts Two, Three, Four, and Six as to Defendant Aegean Shipping Management and dismissed all counts as to Defendant Aegeansun Gamma Inc. ECF No. 273. The court sentenced Defendant Aegean Shipping Management to probation for thirty-six months; the payment of a fine totaling $1.7 million; the payment of a community service payment of $300,000. The court further required Aegean Shipping Management, S.A. implement an environmental compliance plan.

The court held trial for the remaining defendants beginning February 6, 2017, and concluding on February 22, 2017. Prior to trial, Defendant Koutoukakis filed a motion to dismiss, ECF No. 201, which was denied by the court, ECF No. 220. During presentation of the government's case in chief, Defendant Julian, joined by Defendants Koutoukakis and Bounovas, moved for a mistrial, ECF No. 239, which the court denied, ECF No. 241. At the conclusion of the government's case, Defendants moved for acquittal under Federal Rule of Criminal Procedure 29, which the court denied. ECF Nos. 241, 242. After the defense rested and government presented a rebuttal witness, Defendants again moved for acquittal, which the court again denied. ECF No. 243.

At the conclusion of the trial, the jury found Defendant Koutoukakis guilty as to Count One and Count Two, and not guilty as to Count Six. ECF No. 246. The jury found Defendant Julian guilty as to Count One and Count Three, and not guilty as to Count Two and Count Six. *Id.* The jury found Defendant Bounovas not guilty as to all counts against him. *Id.* On February 24, 2017, Defendant Koutoukakis filed a post-trial motion to set aside verdict pursuant to Federal Rule of Criminal Procedure 29(c). ECF No. 252. On March 1, 2017, Defendant Julian filed a

motion to set aside verdict and renewed his motion for a mistrial. ECF No. 256. The government filed a consolidated response to both motions. ECF No. 275. Defendants Koutoukakis and Julian[1] joined each other's motion. ECF Nos. 256, 279.

Defendants moved to set aside the verdict of guilty on numerous grounds. First, Defendants offer "insufficient evidence" arguments: (1) no evidence that they intended to impede a specific investigation; (2) no evidence that Defendant Julian attempted to obstruct justice. Second, they present "Master" arguments: (1) the "Master" of the ship did not present the ORB to the United States Coast Guard ("Coast Guard"); (2) Defendants did not aid and abet the "Master" as the "Master" was not charged. Third, "inconsistent verdicts": (1) Defendant Koutoukakis argues it is inconsistent that he was found not guilty of conspiracy but guilty of failure to maintain and falsification through aiding and abetting; (2) Defendant Julian argues that it is inconsistent that he was found guilty of aiding and abetting falsification of the ORB but not guilty of falsification of documents nor conspiracy. Fourth, "compromise verdicts": Defendants argue that the length of the trial compared to only four hours of deliberations, and the inconsistency of verdicts, demonstrates a "compromise" verdict. Lastly, Defendants move for a mistrial pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), based on the alleged discovery violation regarding a "magic valve" connected to the general services/fire pump.

## II.    ANALYSIS

### a.   Insufficient Evidence

When considering motions for acquittal, the court, after reviewing the evidence in the light most favorable to the government, must determine whether any rational trier of fact could

---

[1] Hereinafter, for ease of reading, "Defendants" will refer solely to Defendants Koutoukakis and Julian.

find the defendant guilty beyond a reasonable doubt. *See* Fed. R. Crim. P. 29; *Hofherr v. Dart Indus., Inc.*, 853 F.2d 259, 261-62 (4th Cir. 1988).

As stated in the jury instructions,[2] the elements for Count One, violation of 33 U.S.C. § 1908, are:

> First, the T/V Green Sky was an oil tanker of 150 gross tons or above that was registered in a country other than the United States;
>
> Second, for the T/V Green Sky, the defendant knowingly and willfully caused the failure by the vessel's master to fail to accurately maintain an Oil Record Book on the vessel.
>
> Third, the Oil Record Book was not accurately maintained, meaning that the Oil Record Book was not reasonably complete and accurate, in that the defendant knowingly: (1) failed to record the quantities of oily mixtures or machinery space bilge water stored within the T/V Green Sky; or (2) failed to record the overboard discharges of oily mixtures or and machinery space bilge water made without using oil filtration equipment, such as the Oil-Water Separator.
>
> Fourth, the failure to maintain the Oil Record Book occurred while the T/V Green Sky was in the navigable waters of, or at a port or terminal of, the United States.

ECF No. 286 at 9-10.[3] The elements for aiding and abetting under 18 U.S.C. § 2(a), are

> First, that the crime charged was in fact committed by someone other than the defendant;
>
> Second, that the defendant participated in the criminal venture as in something that he wished to bring about;

---

[2] See ECF No. 286 for further explanation of the elements.

[3] 33 U.S.C. § 1908(a), makes it a crime to knowingly violate APPS, the regulations issued under APPS, or the MARPOL Protocol, which is an international treaty entered into by the United States. The APPS regulations apply to vessels operated under the authority of other nations when they are present within the navigable waters, ports, or other terminals of the United States. The regulation at issue in this case, 33 C.F.R. § 151.25, requires that every "oil tanker of 150 gross tons or above . . . shall maintain an [ORB]." Additionally, "[e]ntries shall be made in the [ORB] . . . whenever [certain] operations take place," including the disposal or discharge of "oil residue," "oily mixtures," "cleaning water from fuel oil tanks," and "bilge water." Finally, the regulations make the person in charge of the ship responsible for maintaining the [ORB] and making it available for reasonable inspections.

>Third, that the defendant associated himself with the criminal venture knowingly and voluntarily; and
>
>Fourth, that the defendant sought by his actions to make the criminal venture succeed.

*Id.* at 10. Alternatively, to find a defendant guilty for aiding and abetting under 18 U.S.C. § 2(b), the government must show:

>First, that another person committed an act that is prohibited by law; and
>
>Second, that the defendant caused that person to do so.

*Id.* at 12.

For Count Two, violation of 18 U.S.C. § 1519, the government must prove the following elements:

>First, the defendant altered, concealed, covered up, falsified, or made false entries in any record, document, or tangible object, or aided and abetted the alteration, concealment, cover up, falsification, or making of false entries in any record, document, or tangible object; and
>
>Second, the defendant did so knowingly, and
>
>Third, the defendant acted with intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States, or in relation to or contemplation of any such matter or case.
>
>There is no requirement that the matter or investigation have been pending or imminent at the time of the obstruction, but only that the acts were taken in relation to or in contemplation of such matter or investigation.

*Id.* Alternatively, the jury could have found Defendants guilty of Count Two by way of 18 U.S.C. § 2.

For Count Three, violation of 18 U.S.C. § 1505, the government had to prove the following elements:

>First, the defendant endeavored to influence, obstruct, or impede a pending proceeding;

5

    Second, the defendant did so corruptly; and

    Third, the defendant knew that there was a pending proceeding under law, to wit, an investigation by the United States Coast Guard, an agency of the Department of Homeland Security, to determine the vessel's compliance with MARPOL and United States law.

*Id.* at 13.

For Count One, there was sufficient proof at trial, when viewed in the light most favorable to the government, to allow a reasonable juror to conclude beyond a reasonable doubt that Defendants knowingly failed or aided and abetted the failure to maintain an ORB in violation of MARPOL and Act to Prevent Pollution from Ships ("APPS") or that defendants falsified records or aided and abetted the falsification of records. The government produced evidence that a reasonable juror could find the ORB contained false records and that Defendants caused the failure to accurately maintain the ORB. This evidence includes testimony by witnesses that Defendants knowingly input false records into the ORB; demonstrations by witnesses as to how the oily water was pumped overboard bypassing the oily water separator; evidence presented from the sounding logs and alarm logs that was inconsistent with the records in the ORB; and Defendants' signatures on the ORB. Lastly, there was sufficient evidence that the ORB was presented to the Coast Guard within the Port of Charleston, South Carolina, demonstrating a failure to maintain the ORB within the navigable waters of the United States.

For Count Two, there was sufficient proof at trial for a reasonable juror to conclude that Defendant Koutoukakis knowingly falsified the ORB, by comparing the ORB to the sounding logs and record book. Further, the government presented evidence that Defendant Koutoukakis took these actions in contemplation of an investigation or proper administration of a matter. As stated in the jury instructions, this does not require the government to prove that the defendant

had the intent to impede a specific investigation but that the defendant knew an investigation may occur and his actions were intended to impede, obstruct, or influence such investigation. ECF No. 286 at 12. The court finds that, at trial, the government provided sufficient information that Defendant Koutoukakis was aware the T/V Green Sky was heading to the United States. The evidence supports that Defendant Koutoukakis was aware an inspection could occur in the United States and his actions regarding the ORB would impact said inspection, a proper administration of an agency of the United States. The government did not need to prove Defendant Koutoukakis knew of a specific pending or imminent investigation at the time of the falsification.

For Count Three, there was sufficient proof at trial for a reasonable juror to find that Defendant Julian obstructed an agency proceeding. The government presented evidence that Defendant Julian attempted to hide the sounding logs by denying he knew the logs existed. The government additionally presented a witness who stated Defendant Julian attempted to retrieve the sounding logs from the possession of the Coast Guard. While Defendant Julian presented competing evidence, when viewing the evidence in the light most favorable to the government, a reasonable juror could find Defendant Julian guilty of Count Three.

### b. "Master" arguments

Defendants argue that the "Master" never "presented" the ORB to the Coast Guard because the Coast Guard seized the ORB; therefore, they cannot be found guilty of Count One. The government responds:

> [t]here is no requirement that the Master actually physically "present" the [ORB] to boarding authorities. The commission of APPS and Sarbanes-Oxley crime does not stand on such ceremony. The Master still fails to maintain the [ORB] . . . regardless of whether the Coast Guard finds the book on its own or whether another crewmember hands over the record book.

7

ECF No. 275 at 10 n.5. The court agrees with the government. There is no element that the Master physically present the ORB to the Coast Guard. *See* ECF No. 286 at 9-10. The crime arises from "failure to maintain," which "means that the Captain or Master ensure that the Book is reasonably complete and accurate, or at least not knowingly inaccurate upon entering the ports or navigable waters of the United States." *Id.* at 10. Indeed, the crime occurs when the false ORB enters the waters of the United States, not when it is seized by or presented to the Coast Guard.

Further, Defendants argue the Master was never charged with 33 U.S.C. § 1908; therefore, Defendants cannot be charged. As stated in the jury instructions, the Master need not be charged with the underlying crime. ECF No. 286 at 11. Charging the perpetrator is not a requirement of "aiding and abetting." As the jury instructions stated:

> It is not necessary that the person who was aided and assisted be tried and convicted of the offense.
>
> It is not necessary that the government prove the actual identity of the perpetrator of the crime. The government must prove that the underlying crime was committed by some person and that the defendant aided and abetted that person.

ECF No. 286 at 11.

Accordingly, the court denies Defendants' motion for acquittal based on Defendants' "master of the ship" arguments.

### c. Inconsistent Verdicts

In *Dunn v. United States*, 284 U.S. 390, 393 (1932), the Supreme Court noted "[c]onsistency in the verdict is not necessary. Each count in an indictment is regarded as if it was a separate indictment." The Supreme Court in *United States v. Powell*, 469 U.S. 57, 64-65 (1984), emphasizing the holding of *Dunn*, held:

> As the *Dunn* Court noted, where truly inconsistent verdicts have been reached, '[t]he most that can be said . . . is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not

> show that they were not convinced of the defendant's guilt.' *Dunn*[, 284 U.S.] at 393. The rule that the defendant may not upset such a verdict embodies a prudent acknowledgment of a number of factors. First, as the above quote suggests, inconsistent verdicts—even verdicts that acquit on a predicate offense while convicting on the compound offense—should not necessarily be interpreted as a windfall to the Government at the defendant's expense. It is equally possible that the jury, convinced of guilt, properly reached its conclusion on the compound offense, and then through mistake, compromise, or lenity, arrived at an inconsistent conclusion on the lesser offense.

In *Powell*, the Supreme Court declined to disturb an inconsistent verdict even though the counts could be considered "interdependent," meaning that one count was a predicate offense of another. *Id.* at 69.

Defendant Koutoukakis argues

> [t]he government's theory of the case and presentation of all of the evidence in the case is inconsistent with a verdict that finds Mr. Koutoukakis guilty of counts 1 and 2 by acting alone. In fact, under the government's theory of aiding and abetting, and from the facts presented at trial, it is not possible that Mr. Koutoukakis was guilty of Counts 1 and 2 by acting alone.

ECF No. 252 at 2. Defendant Julian argues that

> it is impossible to be guilty of Count 1 for failing to accurately maintain an [ORB], although not guilty of Count 2 for falsification of an [ORB] for exactly the same allegations for failing to maintain an accurate [ORB] . . . . Furthermore, the objects of the conspiracy listed in Count 6 are based upon ordering and/or concealing illegal bilge discharges. Mr. Julian was found not guilty of ordering anyone to illegally discharge bilge water . . . and not guilty to falsifying the [ORB]. Therefore it is impossible for him to be guilty of failing to maintain an [ORB] under any theory.

ECF No. 256 at 2-3.

For Defendant Koutoukakis, the not guilty verdict regarded the conspiracy charge, Count Six, which requires the government prove more than simply aiding and abetting. While the acts used to charge Counts One and Two were the same as those used in Count Six, the overall crimes were different and required different elements. Accordingly, they are not inconsistent verdicts.

9

For Defendant Julian, at first glance, the counts appear interdependent on each other. It seems illogical to be found not guilty of falsifying the ORB yet guilty of failing to maintain an ORB. However, the elements are slightly different for Counts One and Two. The jury could have found that Defendant Julian falsified the record but did not do so with the intent to impede an investigation, which would make him guilty of presenting a false ORB (Count One) but not falsification (Count Two). Regardless, *Powell* dictates that the court view an inconsistent verdict, even if on interdependent counts, as the jury acting favorably to the defendant. Accordingly, the court should assume that the not guilty verdict for Count Two was the jury exercising leniency and the guilty verdict for Count One was the jury's true belief. For the reasons stated for Defendant Koutoukakis, a not guilty verdict on Count Six is not inconsistent with a guilty verdict for Count One. The court declines to vacate the guilty verdicts on the basis of inconsistent verdicts.

### d. <u>Compromise Verdict</u>

Under Federal Rule of Criminal Procedure 33, "upon defendant's motion a court may vacate any judgment and grant a new trial if the interest of justice so requires." This includes situations where a "compromise verdict" may have been reached. *See United States v. Folio*, 851 F.2d 357, at 1 (4th Cir. 1988) (unpublished). Generally, a question of "compromise verdict" arises when the jury convicts of a lesser included offense or if the verdicts are otherwise inconsistent. *Missouri v. Hunter*, 459 U.S. 359, 372 (1983); *United States v. Campbell*, 162 F.3d 1156 (4th Cir. 1998).

Defendants cite the lengthy trial, short deliberation time, and inconsistent verdicts as their evidence that the jury delivered a "compromise verdict." ECF No. 252 at 2-3. Defendants point to no other evidence for their "compromised verdict" argument. While the deliberations were

short, the jurors appeared interested in the case, were not rushed by the court, and the charges mostly focused on whether the jurors believed the ORB was accurate or not. The inconsistent verdict argument does not itself demonstrate a "compromise verdict." As noted by *Powell*, the jury may have reached the allegedly inconsistent verdicts through "mistake, compromise, or lenity," but the court cannot set aside the guilty verdict on that basis. *See* 469 U.S. at 150. While the question of a "compromise verdict" is a serious issue, the court does not find there is sufficient evidence to demonstrate a compromise verdict occurred in this case. Regardless of length of deliberations, the jury was instructed on the seriousness of the case and the responsibility they had in delivering a true and just verdict. Without additional evidence, the court declines to calls into question whether the jury followed the court's instructions. The court denies Defendants' motion to acquit based on an alleged "compromise verdict."

      e.  **<u>Mistrial/Discovery Violation</u>**

Defendants move for a mistrial based on an alleged discovery violation. Defendants argue, based on Expert Witness Dolan's ("Dolan") testimony, in June 2016, Henry De Luna ("De Luna"), the prosecution's main witness, informed the government and Dolan that he showed the "magic valve" to the Coast Guard and the Coast Guard did not take a photo but may have taken a sample of the valve. Defendants alternatively argue that, based on De Luna's testimony, the Coast Guard took a sample from the "magic valve" and did not disclose such evidence to Defendants. At trial and in the post-trial motions, Defendants argue that the government's failure to inform Defendants of this conversation, or failure to disclose the sample, violates the prosecution's duty under *Brady*.

In *Brady*, the Supreme Court held that "the suppression of evidence by the prosecution of evidence favorable to an accused upon request violates due process whether the evidence is

11

material either to guilty or punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. There are three components to a *Brady* violation: "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the [Government], either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). The nondisclosure of evidence must be material, *i.e.*, "so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Id.*

The first two elements under *Brady* are met. First, as noted by Dolan, the general services/fire pump method of illegal discharge would not be possible without the modification of the "magic valve." Trial Tr. 120:18-21, ECF No. 265. In June 2016, De Luna allegedly told the prosecution that he showed the modified valve to the Coast Guard and further stated that the Coast Guard either took a photo or a sample of the modified valve. Present at the meeting with De Luna were Assistant United States Attorneys Christopher Hale, Kenneth Nelson, and Matt Austin; Coast Guard Special Agent David Thirkettle; and Dolan. No evidence of a sample, photo, or De Luna's statement was turned over to the defense teams. ECF No. 256 at 4. The report the government turned over to Defendants merely stated:

> While reviewing a schematic of the [general services/fire pump] De Luna . . . communicated that the Bilge Line Valve (#2) was originally a Stop-Check valve, but was modified to allow for the illegal discharge. The previous oiler [ ] told him about the valve and showed it to him during hand over. De Luna was able to see the inside of the valve and confirm the Stop-Check portion of the valve had been modified and that the disc portion of the valve moved with the valve stem, allowing for the valve to function as a traditional OPEN/CLOSED valve.

ECF No. 275-1. At trial, De Luna testified that he showed the Coast Guard the "magic valve" but that the Coast Guard did not take photos of the "magic valve." De Luna Trial Tr. 282:5-17, ECF No. 263. De Luna then stated that the Coast Guard took a sample from the "magic valve." Trial

Tr. 288:12-14, ECF No. 263. De Luna stated that the Coast Guard did not "pay much attention" to him opening the "magic valve" but did take a sample from the "magic valve." Trial Tr. 322:15-24, ECF No. 263. On cross-examination, Dolan testified that, during the June 2016 meeting, De Luna explained how he opened the "magic valve" and showed the "magic valve" to the Coast Guard but Dolan did not remember De Luna stating the Coast Guard took a photo or sample. Trial Tr. 204:19-206:6, ECF No. 265. On re-direct examination, Dolan stated that he did not recall whether De Luna stated the Coast Guard took a photo of the "magic valve"; however, the Coast Guard did take photographs of the "bilge pump valves near where the magic valve would" have been.[4] Trial Tr. 229:23-230:9, ECF No. 265. Dolan next stated he was "pretty sure" De Luna said the Coast Guard took a sample of the valve. Trial Tr. 230:13-21, ECF No. 265. However, Dolan further stated that he did not see a sample from the "magic valve" on the official Coast Guard report. Trial Tr. 230:22-231:6, ECF No. 265. In an email to the court, sent on February 15, 2017, and now made a part of the record, Special Agent Thirkettle stated:

> According to my notes and reports, we did not learn of the altered valve until the 06/17/2016 interview with De Luna. It was only after that interview that demonstrative valves were even thought of.
>
> I have no specific memory of De Luna saying he showed the [Coast Guard] or attempted to show the [Coast Guard] the dismantled altered "magic valve" while they were on the vessel during their expanded MARPOL exam, nor do I remember anything about De Luna saying the valve was sampled or photographed. Obviously one question that came up after we learned about the altered valve in June was, "Did you show the [Coast Guard]?"
>
> I do have some memory of at least discussing this with De Luna in some form or fashion during a subsequent interview (likely more recent). To the best of my recollection, the result of the discussion was less than conclusive which explains why it didn't make it in my notes or reports. I seem to remember De Luna saying words to the effect of trying to convey something about the valve to the [Coast Guard], but he wasn't able to adequately make his point or explain it in enough

---

[4] The photographs of the general/fire services bilge pump valves were disclosed to Defendants and are not the basis for Defendant's *Brady* motion.

> detail to the point the [Coast Guard] understood what he was trying to convey. I have no recollection of De Luna saying he attempted to show the [Coast Guard] examiners the dismantled valve, or anything about sampling the valve or photographing the valve. To the best of my knowledge the "magic" valve was never dismantled while the [Coast Guard] examiners were aboard, I haven't heard about this alleged interaction from any of the [Coast Guard] examiners. The altered valve would have been a key piece of evidence and I feel confident that the Coast Guard would not only have taken the information seriously, but would have seized the valve from the vessel. My understanding is that none of the [Coast Guard] examiners even knew an altered valve was part of the illegal bypass, only that the General Service Fire Pump was used along with pre existing engine room piping.

ECF No. 256-1 at 2. De Luna's statement was favorable to the accused as it could have led to the impeachment of either De Luna or various Coast Guard witnesses.

Second, the evidence was suppressed by the government. While the court does not believe the government intentionally suppressed this evidence, it should have been clear that the existence of a "magic valve" was key to using the general services/fire pump method of discharge. Special Agent Thirkettle's statement that "[o]bviously one question that came up after we learned about the altered valve in June was, "Did you show the [Coast Guard]?" demonstrates that this evidence was likely in the possession of the government. The government's failure to disclose the information to the defense teams constitutes suppression. Regardless of whether the discussion with De Luna was "less than conclusive," a statement from a key witness about a key factor in a discharge method should have been disclosed immediately to Defendants.

The last element is not met. De Luna was one of the government's early witnesses. Defendants were able to, and did, critique his credibility in a myriad of ways. Defendants were able to cross examine Coast Guard witnesses after De Luna's testimony. During Defendants cross examination of Coast Guard witnesses, Defendants elicited testimony showing the efficacy of the Coast Guard's investigation on the T/V Green Sky. While Dolan was the last witness in the government's case in chief and corroborated De Luna's statement, the court provided

Defendants with the opportunity to recall any Coast Guard witness. Trial Tr. 259:11-260-10, ECF No. 266. Further, the court issued the following instruction to the jury:

> You have heard some testimony about a sample and a photograph that may have been taken by the Coast Guard of the "magic valve." If it existed, that evidence was not introduced or provided to the defendants. You may infer, but are not required to, that if such evidence existed it may have been beneficial to the defendants. You may also consider that inference when assessing the credibility of the witnesses, in whole or in part. Whether to draw that inference is entirely up to you.

ECF No. 286 at 6. Defendant Julian additionally argues that if the government provided De Luna's statement that he opened the "magic valve" and the Coast Guard took a sample from the valve, he would not have entered into a proffer agreement. *See* ECF No. 280 at 1-2. The court took this into consideration for the remainder of trial and severely limited the use of the proffer. The court initially held that: "[the court is] going to limit the use of the proffer to just what counsel brings up on direct, and also [it] cannot be used or any reference to this valve at all that's in the proffer." Trial. Tr. 19:24-20:2, ECF No. 272. The only time the government attempted to use the proffer to impeach Defendant Julian, the court held that the government could ask him about a statement contained in the proffer regarding the accuracy of the ORB but the government would need to rephrase the question. Trial Tr. 82:2-10, ECF No. 272. The court further granted Defendant Julian's motion to strike the government's question. Trial Tr. 82:7-10, ECF No. 272.

    Defendants have not shown a reasonable probability that their conviction would have been different had these materials been disclosed earlier. Therefore, Defendants fail to show prejudice under *Brady*. As the court finds that there was no *Brady* violation, Defendants' motion for a mistrial is denied.

15

### III.     CONCLUSION

For the foregoing reasons, Defendants' motions to set aside the verdict, for judgment of acquittal, and for a mistrial, are **DENIED**.

s/ Margaret B. Seymour  
Honorable Margaret B. Seymour  
Senior United States District Judge

July 14, 2017  
Charleston, South Carolina

16